KENNETH GLUSMAN, PETITIONER v. THE TRUSTEES OF THE UNIVERSITY OF NORTH CAROLINA, RESPONDENTS
— AND —
ANTHONY B. LAMB, PETITIONER v. THE BOARD OF TRUSTEES OF THE UNIVERSITY OF NORTH CAROLINA, RESPONDENT

No. 113

(Filed 31 July 1972)

1. Domicile § 1— nonresident student — presumption

   A nonresident who enrolls in an institution of higher education in this state and continues his studies in such institution is presumed to be in this state primarily for educational purposes.

2. Colleges and Universities— in-state tuition — regulations — test of validity

   The validity of regulations relating to eligibility for in-state tuition at an institution of higher education is to be tested by traditional equal-protection standards, not by the more stringent standard of whether they were necessary to promote a compelling state interest.

3. Constitutional Law § 20— equal protection — classifications

   The traditional equal-protection test does not require the very best classification in the light of a legislative or regulatory purpose; it does require that such classification in relation to such purpose attain a minimum (undefined and undefinable) level of rationality.

4. Colleges and Universities; Constitutional Law § 20— in-state tuition — regulations — residence requirements — constitutionality

   Regulations of the Board of Trustees of the University of North Carolina which require, as prerequisites for eligibility for in-state tuition, that the student be domiciled in this state and in addition have been so domiciled without being enrolled in an institution of higher education for at least the six months preceding the date of first enrollment or re-enrollment in such an institution, *held* not violative of equal protection as guaranteed by the Fourteenth Amendment of the U. S. Constitution.

5. Colleges and Universities; Domicile § 2— married female student — domicile — standing to object to regulation

   A male student whose domicile in this state was stipulated does not have standing to object to a regulation which automatically bestows domicile on a nonresident female student who marries a North Carolina domiciliary, but which does not confer such status on a male student who marries a domiciliary of this state.

6. Colleges and Universities— domicile — woman who marries N. C. resident — regulation — equal protection

   A regulation providing that the legal residence of a wife follows that of her husband does not grant in-state tuition to a nonresident woman who marries a North Carolina domiciliary solely on account

of her sex and thus deny to men similarly situated a benefit in viola-
tion of the Equal Protection Clauses of the North Carolina and
United States Constitutions, since domiciliary status is not equivalent
to in-state tuition status under the regulations, and the regulations
place upon all students domiciled in North Carolina, regardless of
sex, the burden of showing that they have been domiciled in this
state for six months while not in attendance at an institution of
higher education in order to qualify for in-state tuition.

Justice HIGGINS dissenting.

APPEAL by respondent, Board of Trustees of the University
of North Carolina, from *Braswell, J.,* January 10, 1972 Civil
Session of WAKE Superior Court, certified, pursuant to G.S.
7A-31, for initial appellate review by the Supreme Court.

Kenneth Glusman (Glusman) seeks to recover a judgment
for $1,407.50, the asserted difference between in-state and
out-of-state tuition fees in the Law School of the University
of North Carolina at Chapel Hill (Law School) for the academic
years 1969-1970 and 1970-1971, contending that he established
his domicile in North Carolina on February 1, 1969. Anthony
B. Lamb (Lamb) seeks an order classifying him as eligible for
in-state tuition status in the Law School as of January, 1970,
contending that he established his domicile in North Carolina
at that time. Petitioners assert as ground for their claims that
the regulations of the Board of Trustees on resident status for
tuition payment deny to them the equal protection of the laws
guaranteed by the Fourteenth Amendment to the Constitution
of the United States.

In their petitions for review filed in July, 1971, under
G.S. 143-307, Glusman and Lamb alleged that their applications
to respondent for change of tuition status had been denied.
These allegations were admitted in respondent's answers. (Note:
Neither the date nor the contents of petitioners' applications to
respondent or of respondent's decisions with reference thereto
appear in the record before us.)

The two proceedings were heard together by Judge Bras-
well upon the following

### AGREED STATEMENT OF FACTS

"I. That the tuition regulations under consideration were
adopted by the Board of Trustees of the University of North
Carolina on November 10, 1967, and read as follows:

'1. *General:* The tuition charge for legal residents of North Carolina is less than for nonresidents. To qualify for in-state tuition, a legal resident must have maintained his domicile in North Carolina for at least the six months preceding the date of first enrollment or re-enrollment in an institution of higher education in this State.'

'3. *Adults:* A person twenty-one years of age or older is eligible for in-state tuition if he has maintained continuous domicile in North Carolina for the six months next preceding the date of enrollment or re-enrollment, exclusive of any time spent in attendance at any institution of higher education. An in-state student reaching the age of twenty-one is not required to re-establish residence provided that he maintains his domicile in North Carolina.'

'4. *Married Students:* The legal residence of a wife follows that of her husband, except that a woman currently enrolled as an in-state student in an institution of higher education may continue as a resident even though she marries a nonresident. If the husband is a nonresident and separation or divorce occurs, the woman may qualify for in-state tuition after establishing her domicile in North Carolina for at least six months under the same conditions as she could if she were single.'

'8. *Change of Status:* The residence status of any student is determined as of the time of his first enrollment in an institution of higher education in North Carolina and may not thereafter be changed except: (a) in the case of a nonresident student at the time of his first enrollment who, or if a minor his parents, has subsequently maintained a legal residence in North Carolina for at least six months, and (b) in the case of a resident who has abandoned his legal residence in North Carolina for a minimum period of six months. In either case, the appropriate tuition rate will become effective at the beginning of the term following the six-month period.'

"II. That petitioner Glusman came to North Carolina in September of 1968 and within a few days of his arrival began attending the School of Law of the Universitiy of North Carolina at Chapel Hill and attended the School of Law from September 1968 until June 1969; from September of 1969 until June of 1970; and from September of 1970 until June of 1971.

At the time petitioner Glusman came to North Carolina he had the intent of remaining in the State for an indefinite period of time and at all times involved petitioner Glusman was charged nonresident tuition as required by the regulations adopted by the Board of Trustees of the University of North Carolina on November 10, 1967.

"III. That petitioner Lamb came to North Carolina in September of 1969 and began attending the School of Law of the University of North Carolina at Chapel Hill and attended the School of Law from September of 1969 until June of 1970; from September of 1970 until June of 1971; and from September of 1971 until December of 1971. At the time petitioner Lamb came to the State of North Carolina he had the intention of remaining in the State for an indefinite period of time and at all times involved the petitioner Lamb was charged nonresident tuition.

"IV. That the Board of Trustees Regulations in question do not impede inter-state travel and that all times in question there were numerous nonresident students enrolled in the School of Law of the University of North Carolina at Chapel Hill.

"V. That at all times involved nonresident students enrolled in the School of Law of the University of North Carolina were charged higher rates of tuition than were charged of the resident students enrolled. That for the years designated below, the tuition charged both resident and nonresident students enrolled in the School of Law of the University of North Carolina were as follows:

|         | Resident  | Nonresident |
|---------|-----------|-------------|
| 1968-69 | $175.00   | $700.00     |
| 1969-70 | $175.00   | $850.00     |
| 1970-71 | $225.00   | $950.00     |

"VI. That for the 1969-70 school year, the General Assembly of North Carolina appropriated from State funds to the University of North Carolina at Chapel Hill $1,540.00 for the costs per capita student per annum; that the General Assembly of North Carolina appropriated from State funds to the University of North Carolina at Chapel Hill for the 1970-71 school year, $1,584.00 costs per student per annum. That these figures are reflected from the current operations appropriation

advice prepared by the Budget Division, Department of Administration, State of North Carolina, which advice is attached hereto as Exhibit 1.

"VII. That during the period of time in question, both petitioners Glusman and Lamb have established residence in the State of North Carolina for the purposes of voting and payment of taxes. That the only reason why both were denied, after six months had elapsed, reclassification for tuition purpose to that of resident is that neither maintained a residence in the State for six continuous months exclusive of time spent while in attendance at the University of North Carolina School of Law.

"VIII. That the Board of Trustees Regulation No. 4, set forth in I of the Stipulations permits a nonresident female to acquire a residence through marriage but does not give a nonresident male the same opportunity."

The portion of Judge Braswell's judgment denominated findings of fact consists of the facts set forth in the agreed statement and in addition thereto the following:

"Virtually all the time spent [by Glusman] in Chapel Hill has coincided with his enrollment in the University of North Carolina. At the time of initiating the proceedings for administrative relief Mr. Glusman was twenty-four years of age, married, and living in Chapel Hill."

"At the time of initiating his administrative petition for relief, Mr. Lamb was twenty-nine years of age, married to a person who has heretofore been classified by the Board of Trustees as a resident of the State of North Carolina. He has lived in Carrboro since September, 1969. Virtually all of the time spent in North Carolina has coincided with his enrollment in an institution of higher education, the University of North Carolina."

"[T]he Residence Status Committee of the University of North Carolina, and the Board of Trustees of the University of North Carolina, have not given either petitioner a hearing to listen to the alleged facts of a bona fide change in residence, since the time of first enrollment in an institution of higher education in North Carolina; but the administrative procedures and review prior to reaching Superior Court did determine

that neither student dropped out of enrollment at any time, and neither student re-enrolled after a lapse of six months and that each re-enrollment was a continuing thing in the normal academic year of the University of North Carolina."

Lamb "became a married man after his initial enrollment. His wife was a legal resident of the State of North Carolina. She was entitled to a lower tuition rate than her husband."

After the portion thereof denominated conclusions of law, the judgment entered by Judge Braswell provides:

"NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED, that the tuition regulations which provide that the residence status of any student is forever to be determined as of the time of his first enrollment in an institution of higher education in North Carolina, and that residence status may not thereafter be changed if he continues re-enrollment without first having dropped out of school for at least a six-months' period, is declared unconstitutional.

"The cases of Kenneth Glusman, petitioner, and Anthony B. Lamb, petitioner, are each, hereby remanded to the Residence Status Committee of the University of North Carolina at Chapel Hill; which Committee shall conduct a hearing, after notice, and it shall make a determination of residence of each petitioner during the period involved in each petition; and it shall make such ruling and order as the true facts warrant.

"In its determination of residence status of each petitioner the respondent shall not apply its regulations so as to discriminate against a male student who, being married, has since his first enrollment established a bona fide residence in North Carolina, and whose wife would be qualified to be enrolled as an in-state resident by virtue of the husband being then a legal resident of the State of North Carolina.

"Court costs are taxed against the respondent."

Respondent excepted "[t]o the foregoing findings of fact and conclusions of law, and entry of judgment," and gave notice of appeal. By supplemental order under G.S. 143-316, Judge Braswell stayed the foregoing judgment pending the outcome of respondent's appeal.

*Attorney General Morgan and Deputy Attorney General Vanore for respondent appellant.*

*Kenneth Glusman for petitioner appellees.*

BOBBITT, Chief Justice.

I

The regulations governing tuition status at the time petitioners were enrolled in the Law School established certain requirements for eligibility for in-state tuition. To be eligible, a prospective student (1) must have lived in this state, (2) with intent to make it a home, (3) for at least six months, and (4) without being enrolled in an institution of higher education during the six-month period. Thus, to qualify for in-state tuition, the regulations required that the student be domiciled in this state and in addition have been so domiciled without being enrolled in an institution of higher education for at least the six months preceding the date of first enrollment or re-enrollment in such institution. For full discussion of domicile, see *Hall v. Board of Elections,* 280 N.C. 600, 187 S.E. 2d 52 (1972).

Petitioners do not contest the validity of Regulation No. 1, which provides that "[t]he tuition charge for *legal residents* of North Carolina is less than for nonresidents" and that "[t]o qualify for in-state tuition, *a legal resident* must have maintained his domicile in North Carolina for at least the six months preceding the date of first enrollment or re-enrollment in an institution of higher education in this State." (Our italics.) The State's right to charge nonresidents higher tuition than residents is not challenged and has been repeatedly upheld as reasonably related to the State's legitimate interest in operating, maintaining and financing its educational institutions. *Johns v. Redeker,* 406 F. 2d 878 (8th Cir.), *cert. den. sub nom. Twist v. Redeker,* 396 U.S. 853, 24 L.Ed. 2d 102, 90 S.Ct. 113 (1969). See also, *Bryan v. Regents of University of California,* 188 Cal. 559, 205 P. 1071 (1922); *Landwehr v. Regents of University of Colorado,* 156 Colo. 1, 396 P. 2d 451 (1964); *Clarke v. Redeker,* 259 F. Supp. 117 (S.D. Iowa 1966); *Clarke v. Redeker,* 406 F. 2d 883 (8th Cir.), *cert. den.* 396 U.S. 862, 24 L.Ed. 2d 115, 90 S.Ct. 135 (1969); *Kirk v. Board of Regents of Univ. of California,* 273 Cal. App. 2d 430, 78 Cal. Rptr. 260 (1st Dist. Ct. App. 1969), *app. dism.* 396 U.S. 554, 24

L.Ed. 2d 747, 90 S.Ct. 754 (1970); *Starns v. Malkerson,* 326 F. Supp. 234 (D. Minn. 1970), *aff'd without opinion,* 401 U.S. 985, 28 L.Ed. 2d 527, 91 S.Ct. 1231 (1971); *Thompson v. Board of Regents of University of Neb.,* 187 Neb. 252, 188 N.W. 2d 840 (1971); Spencer, "The Legal Aspects of the Nonresident Tuition Fee," 6 Ore. L. Rev. 332 (1927); Note, "The Constitutionality of Nonresident Tuition," 55 Minn. L. Rev. 1139 (1971); Note, 8 Wake For. L. Rev. 265 (1972).

Petitioners were nonresidents, 21 years of age or more, when they first enrolled in the Law School of the University of North Carolina. It was stipulated that each petitioner had the intention of remaining in North Carolina indefinitely when he came into this state; that, "during the period of time in question," each petitioner "established residence in the State of North Carolina for the purposes of voting and payment of taxes"; and that "the only reason why both were denied, after six months had elapsed, reclassification for tuition purpose[s] to that of resident is that neither maintained a residence in the State for six continuous months exclusive of time spent while in attendance at the University of North Carolina School of Law."

[1] Petitioners concede that respondent could by regulation provide that a nonresident who enrolls in an institution of higher education in this state and continues his studies in such institution is *presumed* to be in this state primarily for educational purposes. *Clarke v. Redeker,* 259 F. Supp. at 122; 55 Minn. L. Rev. at 1158-59. Such a presumption is part of our law, aside from the regulations involved in this case. *Hall v. Board of Elections, supra* at 608, 187 S.E. 2d at 57. Petitioners contend that the *absolute* requirement that they reside in this state for at least six months preceding the date of their reenrollment exclusive of any time spent in attendance in any institution of higher education, notwithstanding they have become domiciliaries, unconstitutionally denied to them rights accorded other domiciliaries of North Carolina.

Petitioners stress *Carrington v. Rash,* 380 U.S. 89, 13 L.Ed. 2d 675, 85 S.Ct. 775 (1965). In that case the United States Supreme Court invalidated a provision of the Texas Constitution prohibiting any member of the Armed Forces who moved his home to Texas during the course of his military duty from ever voting in any election in that state so long as

he was a member of the Armed Forces. It was held that this provision established an "incontrovertible presumption of non-residence," and, as applied to a bona fide domiciliary of Texas, violated the Equal Protection Clause of the Fourteenth Amendment. The real holding in *Carrington* was that a burden may not be imposed on, or a right denied to, a group labeled "non-resident," when such labeling, with such attendant imposition or denial, is not reasonably related to the state interest it seeks to protect. In the present case, petitioners are not labeled as "nonresidents." Whether the denial of a benefit to a certain class of residents (domiciliaries) in the present case, with its peculiar facts, is reasonably related to the state interest the classification is meant to protect, is not determined by the holding in *Carrington,* involving an entirely different set of facts.

In *Shapiro v. Thompson,* 394 U.S. 618, 22 L.Ed. 2d 600, 89 S.Ct. 1322 (1969), the Supreme Court held that state durational residence requirements penalized the exercise of a person's basic constitutional right to travel freely from one state to another by rendering him ineligible for welfare assistance, thereby depriving him of a right secured by the Equal Protection Clause of the Fourteenth Amendment. In *Dunn v. Blumstein,* 405 U.S. 330, 31 L.Ed. 2d 274, 92 S.Ct. 995 (1972), the Supreme Court considered Tennessee constitutional and statutory provisions which required residence in the state for one year for eligibility to vote in a state election. It was held that these provisions, as applied to a bona fide resident of Tennessee for less than one year, deprived such a resident of the rights to vote and to freedom of interstate travel in violation of the Equal Protection Clause of the Fourteenth Amendment.

In *Shapiro* and in *Dunn,* the state durational residence requirements were subjected to the most stringent test, namely, whether they were *necessary* to promote a *compelling* state interest.

[2] A person's right to eligibility for in-state tuition is quite different from his basic constitutional right to travel freely from one state to another *(Shapiro* and *Dunn)* or his basic constitutional right to vote *(Dunn).* We take notice of the stipulation that the regulations in the present case "do not impede interstate travel." Since they do not relate to basic constitutional rights, the regulations are to be tested by the less stringent traditional equal-protection standards.

[3]   The traditional equal-protection test does not require the very best classification in the light of a legislative or regulatory purpose; it does require that such classification in relation to such purpose attain a minimum (undefined and undefinable) level of rationality. "In the area of economics and social welfare, a state does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Dandridge v. Williams,* 397 U.S. 471, 485, 25 L.Ed. 2d 491, 501-02, 90 S.Ct. 1153, 1161 (1970).

In *Landwehr v. Regents of University of Colorado, supra,* and in *Thompson v. Board of Regents of University of Neb., supra,* statutory provisions requiring as prerequisites for eligibility for in-state tuition, domiciliary status *and* actual residence within the state for a specified period exclusive of time spent in any institution of higher education, were upheld as reasonably related to a legitimate state objective. In *Newman v. Graham,* 82 Idaho 90, 349 P. 2d 716, 83 A.L.R. 2d 492 (1960), a similar requirement was held to be unconstitutional on the ground that it was "arbitrary, capricious and unreasonable."

In the establishment and operation of its institutions of higher education, North Carolina's obligation and primary purpose is to provide opportunities to citizens of this state. In furtherance thereof, in-state students are not required to pay tuition fees equivalent to the per capita cost but may enroll upon payment of the low in-state tuition. North Carolina is not in a position to provide opportunities to citizens of other states on this low-cost basis. Indeed, in view of present crowded conditions, only a limited number of persons domiciled in other states may be enrolled in our institutions of higher education.

[4]   North Carolina's right to require a domiciliary of another state to pay the higher out-of-state tuition fees upon his initial enrollment in an institution of higher education is not in dispute. The question is whether it is reasonable for the State to require that such person, in addition to being domiciled in North Carolina, be so domiciled while not in attendance at an institution of higher education for a six-month period, before he may qualify for in-state tuition.

We hold that such requirement is reasonable. The object is to assure that students who benefit from the in-state tuition subsidy the State provides for its citizens are in fact its own citizens. The Board of Trustees has determined that domicile alone is insufficent for this purpose. Domicile is solely a matter of physical presence plus the intent to make a home. All students enrolled in our institutions of higher education visibly meet the first requirement of domicile. The second requirement, however, is a concept in the mind of a particular student. It is true, as this Court emphasized in *Hall v. Board of Elections, supra,* that there are objective indicia by which a person's statement of intent may be tested. Even so, a statement of intent is usually difficult to disprove; and the determination of a student's domicile is especially difficult and subject to doubt. Ordinarily, whatever plans students may have with reference to where they will locate when they complete their attendance in an institution of higher education are in flux, frequently changed as unforeseeable circumstances and opportunities influence their future careers. Hence, the Board of Trustees has determined that domicile is only one of the prerequisites for in-state tuition status.

The State has no obligation to provide educational opportunities to noncitizens. Its interests require that it subsidize only those students whom it may be certain are North Carolina citizens. Moreover, uncertainty as to the circumstances under which the tuition status of students may change is fiscally and administratively undesirable.

The six-month nonattendance requirement adds objectivity and certainty to the requirement of domicile. It is a certainty not obtained by placing an unreasonable burden on students. Petitioners were not barred by respondent's regulations from becoming domiciliaries of North Carolina. Nor were they barred from becoming eligible for in-state tuition. Rather, they were only required, if they wanted that status, to be domiciled in North Carolina for six months while not in the Law School. They must be deemed to have enrolled in the Law School with full knowledge of the tuition-status requirements. If they had complied with the requirements for eligibility for in-state tuition, their statement of intent to make North Carolina their home would have been borne out by an objective indication of their earnestness. That the Board of Trustees might have

chosen other objective indicators to test the domiciliary intent of applicants for in-state tuition is not to say the one chosen was unreasonable. That there may be hardship cases resulting from the enforcement of these regulations is also not to say they are unreasonable. The constitutional test is whether the regulations have tended in general to assure that only North Carolina citizens get the benefit of in-state tuition. We hold that they have.

## II

[6] Apart from the foregoing, petitioner Lamb contends he became eligible for in-state tuition status as of January, 1970, under Regulation No. 4, because of his marriage to a North Carolina domiciliary. Regulation No. 4 provides: "4. *Married Students:* The legal residence of a wife follows that of her husband, except that a woman currently enrolled as an in-state student in an institution of higher education may continue as a resident even though she marries a nonresident. If the husband is a nonresident and separation or divorce occurs, the woman may qualify for in-state tuition after establishing her domicile in North Carolina for at least six months under the same conditions as she could if she were single." Lamb contends that Regulation No. 4 grants in-state tuition to a nonresident woman who marries a North Carolina domiciliary solely on account of her sex and thus denies to men similarly situated a benefit in violation of the Equal Protection Clauses of the North Carolina and United States Constitutions.

Paragraph VIII of the AGREED STATEMENT OF FACTS provides "[t]hat the Board of Trustees Regulation No. 4 ... permits a nonresident female to acquire a residence through marriage but does not give a nonresident male the same opportunity." Although not included in the stipulations, the court found that Lamb "became a married man after his initial enrollment"; that "[h]is wife was a legal resident of the State of North Carolina"; and that "[s]he was entitled to a lower tuition rate than her husband." The date of Lamb's marriage is undisclosed. Presumably, since the court found that "[s]he was entitled to a lower tuition rate than her husband," Mrs. Lamb had been a domiciliary for at least six months exclusive of any time spent in attendance at any institution of higher education. The record indicates she had not enrolled in any institution of higher education but was employed at the Research Triangle Institute.

The foregoing constitutes the only pertinent factual data before us with reference to Lamb's claim to in-state tuition status on account of his marriage.

Regulation No. 4 makes no provision for a change in the "legal residence" (domicile) of a nonresident man upon his marriage with a resident woman. The difference in the treatment of the sexes is this: When the nonresident woman marries the resident man, *ipso facto* she becomes a domiciliary of this state from the date of her marriage. *Kirk v. Board of Regents of Univ. of California, supra.* When the nonresident man marries the resident woman, he does not automatically become a domiciliary of this state but must establish that he has become a domiciliary by traditional proofs. For the reasons stated below, we need not consider whether this difference constitutes unreasonable discrimination.

[5]  Independent of his marriage to a North Carolina resident, the stipulations establish that Lamb became a domiciliary of North Carolina as of a date prior to completion of his attendance in the Law School. Since Lamb's domiciliary status has never been in question in this case, Lamb does not have standing to object to the automatic bestowal of domicile on a nonresident woman who marries a North Carolina domiciliary.

[6]  As stated above, the regulations required that Lamb, to be eligible for in-state tuition status, show not only (1) that he was a domiciliary of North Carolina, but also (2) that he was a domiciliary of North Carolina for six continuous months exclusive of time spent while in attendance at the Law School. Under the regulations, domiciliary status was not equivalent to in-state tuition status. Although a woman was deemed a domiciliary of North Carolina from the date of her marriage, to become eligible for in-state tuition a married woman, just as Lamb or any other student, had to establish actual residence in this state for six continuous months exclusive of the time spent while in attendance at an institution of higher education. The regulations, including Regulation No. 4, placed upon *all* students domiciled in North Carolina, *regardless of sex*, the burden of showing that they had been domiciled in North Carolina for six months while not in attendance at an institution of higher education, to qualify for in-state tuition. Therefore, Lamb's equal-protection argument fails.

Only two cases have come to our attention which involve regulations similar in some respects to Regulation No. 4.

In *Kirk v. Board of Regents of Univ. of California, supra,* the regulation provided that "[t]he residence of the husband is the residence of the wife . . . . " The petitioner (wife), a resident of Ohio, married a California resident on July 1, 1967, and became a resident of California as of that date. The denial of her right to enroll in the University of California in September, 1967, as an in-state student was upheld because she was not "a resident student," a term defined in the regulations as "any person who has been a bona fide resident of the State for more than one year immediately preceding the opening day of a semester during which he proposes to attend the university." The court rejected the petitioner's contention that the period of her husband's residence in California preceding the marriage should be retroactively "tacked" to the period of her residence after the marriage.

In *Clarke v. Redeker,* 259 F. Supp. 117, a three-judge federal court upheld a regulation which provided: "The residence of a wife is that of her husband. A nonresident female student may attain residence through marriage, and correspondingly, a resident female student may lose residence by marrying a nonresident."

We hold that the regulations as interpreted herein are valid and are not subject to successful attack by petitioners. Accordingly, the judgment of the court below is reversed.

Reversed.

Justice HIGGINS dissenting.

In the short time at my disposal and before the majority opinion becomes the law of this case, I have prepared and now record my dissent. The trustees, I think, have authority to fix a higher tuition rate for nonresident students than required of resident students for the same course of study. In my opinion, they do not have authority to fix a different rate for resident students.

The record indicates that all students are required to register and pay tuition in advance at the beginning of each school

year. If a nonresident student becomes a resident of North Carolina during a school term, in my opinion, thereafter he is entitled to register and pay tuition according to his actual residential status. Any other rule would be discriminatory and the denial of equal protection of the laws.

In order to prevent false claims of change in residence, the trustees require that when a nonresident student registers he continues to be a nonresident continually thereafter so long as he remains a student. He cannot raise the question of his actual residence until he quits school for at least six months and then re-enters. Hence the rule for all practical purposes raises a conclusive, irrebuttable presumption that he has not changed in fact, but continues a nonresident. The trustees say any other rule would permit false claims. However, the purpose of the hearing is to determine the bona fides of a claim rather than conclusively to presume it to be false. That a rule may on occasion be violated is not just cause for abrogation. An occasional violation is not the test either of its validity or its wisdom. The fact that false claims may be filed is not ground to deny just ones.

In this case, Glusman and Lamb each registered as a nonresident and paid the required nonresident tuition fees. Before they completed their courses of study they alleged they became residents of North Carolina, registered, voted, and paid taxes as such.

At the beginning of the next school year, they sought to register as residents of North Carolina and to be admitted on the payment of tuition fees charged other residents. Their claims were denied on the ground the first registration froze their status and they could not thereafter raise the question of their actual residence. At registration they were required to pay nonresidence fees approximately four times the amount charged other residents of the State. They filed claims for refund which the committee of the trustees denied; thereupon, they filed this action in the Superior Court of Wake County for review of the administrative decision denying their claims.

After hearing in the Superior Court, Judge Braswell entered judgment of which the following is a part:

"2. That the tuition regulations of November 10, 1967, do establish an irrebuttable presumption of nonresidence

for all students twenty-one years of age or over who first enroll as a nonresident. Each petitioner is over twenty-one years of age. Each petitioner first enrolled as a nonresident.

"3. The Board of Trustees of the University of North Carolina may not establish an irrebuttable presumption of nonresidence upon the basis that a student once enrolled as a nonresident, paying nonresident tuition fees, cannot thereafter become a bona fide resident, short of dropping out of enrollment in an institution of higher education in North Carolina for at least six months before re-enrollment as a student. This irrebuttable presumption denies each petitioner the equal protection of the law. The petitioners should have the opportunity to present their facts before the Residence Status Committee of the University.

* * * * * * * * * * *

"5. There is no rational or reasonable basis on which an individual who has been a bona fide resident of and domiciled in the State of North Carolina for the initial time period required by law, why he should be denied the right to prove the fact of bona fide domiciled resident simply because he was in attendance of an institution of higher education in this State.

"Now, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED, that the tuition regulations which provide that the residence status of any student is forever to be determined as of the time of his first enrollment in an institution of higher education in North Carolina, and that residence status may not thereafter be changed if he continues re-enrollment without first having dropped out of school for at least a six-months' period, is declared unconstitutional."

Judge Braswell ordered the case remanded to the proper committee of the trustees for determination of the citizenship status of the students at the time they registered and paid the fees now involved in this proceeding.

Judge Braswell refused to recognize the validity of the trustees' claims that a student's residential status is fixed for all years following his registration unless he quits school and remains absent for at least six months. For all intents and purposes the rule creates a conclusive, irrebuttable presumption against any change of residential status.

The foregoing is contrary to our rule which is succinctly stated by a great lawyer who graced this Court during the present generation. In *Trust Company v. Andrews,* 264 N.C. 531, 142 S.E. 2d 182, Justice William B. Rodman, Jr. stated the rule: "The power to create a presumption cannot be made a device to short-circuit constitutional prohibitions." A student, or any other person who becomes of age, has a right to change his residence. The denial of this right, or its lawful exercise, is a denial of a constitutional guarantee. *Newman v. Graham,* 349 P. 2d 716; *Carrington v. Rash,* 380 U.S. 89, 13 L.Ed. 2d 675.

The motif of the Court's opinion in this case is political rather than judicial and denies to the claimants the right to be heard on the bona fides of their claims.

I vote to affirm the judgment of the Superior Court.